# No. 25-10954

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

E'Mann Comichi,

Plaintiff - Appellant

v.

Officer Ingrid A. Pethel; Officer Brian S. Lord; Officer Wesley R. Hamilton; Detective William M. Norwood; Bert Gibbons; B & B Wrecker Service, Incorporated,

Defendants - Appellees

---

## On Appeal from
United States District Court for the Northern District of Texas

4:25-CV-512

# BRIEF OF APPELLANT E'MANN COMICHI

SUBMITTED BY:

Brandon Grable
Grable, P.L.L.C.
12451 Starcrest Drive
San Antonio, TX 78216

# **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| B & B Wrecker Service, Incorporated | Christopher Brown Fort Worth, TX |
| Bert Gibbons | Christopher Brown Fort Worth, TX |
| Wesley Hamilton | David Montgomery and Alyssa Barreneche of D. Randall Montgomery & Associates, P.L.L.C. Dallas, TX |
| Brian Lord | David Montgomery and Alyssa Barreneche of D. Randall Montgomery & Associates, P.L.L.C. Dallas, TX |
| William Norwood | David Montgomery and Alyssa Barreneche of D. Randall Montgomery & Associates, P.L.L.C. Dallas, TX |
| Ingrid Pethel | David Montgomery and Alyssa Barreneche of D. Randall Montgomery & Associates, P.L.L.C. Dallas, TX |

| Appellants: | Counsel for Appellants: |
|---|---|
| E'Mann Comichi | Brandon Grable of Grable, P.L.L.C. San Antonio, TX |

<u>S/Brandon Grable</u>
Attorney of record for Appellant

# STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument. This appeal presents important questions regarding the proper application of Rule 12(b)(6) standards when qualified immunity is asserted, the interpretation of *Anderson v. Valadez*, and the application of *Turner v. Driver* to cases involving manufactured detentions. Oral argument would assist the Court in resolving these significant issues and in evaluating timestamped video evidence that contradicts the district court's factual findings.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ...................................................v

TABLE OF CONTENTS......................................................................................... vi

TABLE OF AUTHORITIES ................................................................................. viii

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE ISSUES...............................................................................2

STATEMENT OF THE CASE..................................................................................3

SUMMARY OF THE ARGUMENT ........................................................................8

ARGUMENT ..........................................................................................................15

   I.    STANDARD OF REVIEW..........................................................................15

   II.    THE DISTRICT COURT VIOLATED RULE 12(b)(6) AND *ANDERSON*

   *V. VALADEZ* BY RESOLVING DISPUTED FACTS AND DRAWING

   INFERENCES AGAINST COMICHI AT THE PLEADING STAGE...............17

   III.    ALTERNATIVELY, EACH CLAIM INDEPENDENTLY SURVIVES

   UNDER PROPER RULE 12(b)(6) STANDARDS ...........................................27

CONCLUSION........................................................................................................56

CERTIFICATE OF SERVICE ...............................................................................58

CERTIFICATE OF COMPLIANCE ..........................................................59

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Valadez*, 845 F.3d 589 (5th Cir. 2016) ............................................ passim
*Arizona v. Johnson*, 555 U.S. 323 (2009) .................................................................. 47
*Bailey v. Iles*, 87 F.4th 275 (5th Cir. 2023) ........................................................ 37, 39
*Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154 (Tex. 2016) ................ 25
*Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991) ......................................... 25
*Byrd v. United States* 584 U.S. 395 (2018) ........................................................ 52, 53
*Calhoun v. Hargrove*, 312 F.3d 730 2002) .............................................................. 17
*Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024) .............................. 14, 32, 34, 35
*Degenhardt v. Bintliff*, 117 F.4th 747 (5th Cir. 2024) ............................................. 52
*Espinal v. City of Houston* 96 F.4th 741 (5th Cir. 2024). ........................................ 54
*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) ......................................... 40
*Florida v. Bostick*, 501 U.S. 429 (1991) ............................................................ passim
*Freeman v. Gore*, 483 F.3d 404 (5th Cir. 2007) ....................................................... 38
*Guerra v. Castillo*, 82 F.4th 278 (5th Cir. 2023) .................................................... 20
*Harmon v. City of Arlington*, 16 F.4th 1159 (5th Cir. 2021) ............................... 18, 24
*Hicks v. LeBlanc*, 81 F.4th 497 (5th Cir. 2023) ...................................................... 19
*Morris v. Livingston*, 739 F.3d 740 5th Cir. 2014) .................................................. 17
*Schultea v. Wood*, 47 F.3d 1427, (5th Cir. 1995) ..................................................... 17
*Scott v. Harris* 550 U.S. 372 (2007) ............................................................. 17, 18, 24
*Smith v. Lopez*, 519 F. Supp. 3d 395, 408 (W.D. Tex. 2021) .............................. 28, 39
*Terry v. Ohio*, 392 U.S. 1, 30 (1968) ............................................................. 47, 48, 51
*Terwilliger v. Reyna*, 4 F.4th 270 (5th Cir. 2021) .................................................... 20
*Thompson v. Clark*, 596 U.S. 36 (2022) ........................................................ 4, 15, 54
*Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017) ................................................... passim
*United States v. Kye Soo Lee* 898 F.2d 1034 (5th Cir. 1990) ................................... 53
*United States v. Monsivais*, 848 F.3d 353 (5th Cir. 2017) ........................................ 23
*Voss v. Goode*, 954 F.3d 234 (5th Cir. 2020) ........................................................... 37
*Wallace v. Kato*, 549 U.S. 384 (2007) ..................................................................... 55
*West v. Atkins*, 487 U.S. 42 (1988) ......................................................................... 52
*Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013) ...................................................... 50
*Whole Woman's Health v. Jackson*, 642 S.W.3d 569 (Tex. 2020) ............................. 25

**Statutes**

28 U.S.C. § 1291 ......................................................................................................... 3
28 U.S.C. § 1331 ......................................................................................................... 3
42 U.S.C. § 1983 ...................................................................................................... 3, 9

Tex. Civ. Prac. & Rem. Code § 134.002(2) ........................................................ 57

Texas Occupations Code § 2308.255(e)........................................................ 8, 52

Texas Occupations Code § 2308.404 ........................................................ 16, 56

Texas Penal Code § 38.02 ........................................................14, 31, 36, 43

Texas Penal Code § 38.15(a)(1) ........................................................13, 36, 37, 39

Texas Penal Code § 38.15(d) ........................................................ 13

Texas Penal Code § 6.03(d) ........................................................ 39

**Municipal Ordinances**

City of Euless Municipal Code § 90-94(c) ........................................................ passim

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment dismissing Appellant's civil rights claims under 42 U.S.C. § 1983. The district court had original jurisdiction under 28 U.S.C. § 1331. The district court entered its final order on August 15, 2025. Appellant timely filed this appeal.

# STATEMENT OF THE ISSUES

1. Whether the district court violated Federal Rule of Civil Procedure 12(b)(6) and *Anderson v. Valadez* by resolving disputed facts, drawing inferences against Comichi, and making factual findings contradicted by body camera evidence and alleged facts at the pleading stage.—errors that pervade the dismissal of all claims and require wholesale reversal.

2. Alternatively, whether the district court erred in dismissing Fourth Amendment claims when officers acknowledged protected conduct by offering drop fees, then manufactured detention and arrested without probable cause for refusing to identify in violation of *Turner v. Driver*. and *Florida v. Bostick*.

3. Alternatively, whether the district court erred in dismissing malicious prosecution claims despite Comichi sufficiently pleading the elements under *Thompson v. Clark*.

4. Alternatively, whether the district court erred in dismissing tow defendant claims when factual disputes about municipal ordinance interpretation preclude dismissal under Rule 12(b)(6).

# STATEMENT OF THE CASE

## Nature of the Case

This civil rights action—with supplemental state law claims related to the tow—challenges the search, seizure, arrest, and malicious prosecution of E'Mann Comichi for exercising rights protected under City of Euless Municipal Code § 90-94(c). Body camera recordings captured the constitutional violations and prove the district court made factual findings contradicted by objective evidence.

## Factual Background

On September 22, 2024, Comichi was authorized by his nephew to use a rental truck. **ROA 11**. Comichi had paid for the rental, and his nephew—who was leaving town—gave Comichi express authorization to access and use the truck during his absence. **ROA 11**.

City of Euless Municipal Code § 90-94(c) grants "the owner, authorized operator, or authorized agent of the owner" an "absolute right to regain possession" when they arrive "before the vehicle is fully hooked up" and "before its removal from the property." **ROA 12-13**.

A tow truck operator, Bert Gibbons, began towing the truck from a dog park. The tow operator partially hooked the vehicle at the dog park

and moved it to the adjacent street to complete the hookup, as the parking configuration at the dog park did not provide sufficient space to complete the operation. **Hamilton BWC 13:55-14:15;[1] ROA 38**. When Comichi observed this and entered the vehicle, it was positioned on the street where the tow operator intended to complete the hookup process. **Hamilton BWC 01:20-01:25; ROA 38**.

Officer Hamilton arrived first, and at some point, ordered Comichi to exit the vehicle. **(Hamilton BWC 03:32-03:38 ROA 38**). Comichi complied, exiting at 11:36:25 AM. *Id*. The tow operator admitted to Officer Hamilton, in response to Comichi's claim that he had a right to reclaim the vehicle: "He's right, I was not 100% connected to it." **Hamilton BWC 04:59-05:08 ROA 38**.

Officers Pethel and Lord arrived together at timestamp 11:38:35 AM—over two minutes after Comichi had exited. **Lord BWC 00:38 ROA 40**. Comichi was standing outside the vehicle when these officers arrived.

---

[1] Body-worn camera citations refer to video runtime unless otherwise stated (*e.g.*, "13:55") and indicate the minute:second position within the video file. Both Hamilton's and Lord's body worn cameras were submitted as Exhibits 1 and 2 to Comichi's complaint. ROA 38-40.

Officer Pethel asked Comichi to move from the roadway to the sidewalk. **Hamilton BWC 06:14 ROA 38**. Comichi immediately complied. *Id*.

Officer Pethel then conducted a pat-down search of Comichi, with Officer Lord volunteering to hold Comichi's phones during the search. **Hamilton BWC 06:14-07:24 ROA 38**.

Throughout the interaction, officers and Gibbons offered Comichi the option to pay a drop fee to stop the tow. **Hamilton BWC 5:05-5:10 ROA 38]**. Officer Hamilton told Comichi, "Pay the drop fee or don't." **Hamilton BWC 5:14-5:16 ROA 38.** Officer Pethel offered to see if Gibbons would take a drop fee to stop the tow. **Hamilton BWC 5:05-5:10 ROA 38**. Comichi declined and accepted that the tow would proceed.

As Comichi prepared to leave, Officer Pethel stated: "Let me get your name *before you leave*." **Hamilton BWC 10:13 ROA 38**; **Lord BWC 05:00 ROA 40**. When Comichi declined to voluntarily identify, Officer Pethel responded: "I spoke with you and you were detained . . . You're going to give me your name *or else* you're under arrest." **Hamilton BWC 10:15-10:24 ROA 38**. After Comichi again refused, Officer Pethel arrested him.

Officer Lord told his arriving supervisor, "We told him to get out and move, and he's not." **Lord BWC 11:57 ROA 40**. Comichi had exited at 11:36:25 AM, and Lord arrived at 11:38:35 AM—over two minutes later. **Lord BWC 00:38 ROA 40**.

After arrest, officers discussed charging decisions. Officer Hamilton stated "I would just add fail to ID" and Officer Pethel responded "That is exactly what I am doing." **Hamilton BWC 13:22-33 ROA 38**.

Comichi was charged with Interference with Public Duties and Failure to Identify and was incarcerated for approximately 45 hours. **ROA 17**. Both charges were subsequently dismissed in Comichi's favor. **ROA 17**. Detective Norwood determined Pethel and Lord "lacked probable cause to charge him with Interference with Public Duties" and dismissed that charge on September 24, 2024, while Comichi was still in custody. **ROA 26-30**.

The tow operators conducted the tow pursuant to Texas Occupations Code § 2308.255(e) which designates tow truck operators performing nonconsent tows as "agents of the law enforcement agency." **ROA 24**. The vehicle was towed despite the tow operator's admission that it was not fully hooked up and the municipal ordinance's requirement

6

that vehicle operators, owners, and agents have an "absolute right to regain possession" under those circumstances. **ROA 27**.

## Procedural History

Comichi filed suit asserting Fourth Amendment claims against Officers Pethel, Lord, Hamilton, and Detective Norwood under 42 U.S.C. § 1983, and state law claims against Gibbons and B&B Wrecker Service, Inc. All defendants moved to dismiss under Rule 12(b)(6), asserting qualified immunity.

On August 15, 2025, the district court granted both motions with prejudice. **ROA 193-204**. The court found Officer Pethel "observed" Comichi "halting" the tow when she arrived; characterized Comichi as "agitated and hostile"; found Comichi was "detained" and "not free to leave"; concluded probable cause existed for both charges; and held that Comichi's "actions were not proper or protected" under the municipal ordinance. **ROA 193-198, 200**.

This timely appeal followed.

## SUMMARY OF THE ARGUMENT

Officer Pethel recorded herself acknowledging Comichi was "free to leave," **Hamilton BWC 10:13 ROA 38; Lord BWC 05:00 ROA 40**, then manufactured detention and arrested him for refusing to identify during that detention—a clear violation of *Turner v. Driver*. captured on body camera. 848 F.3d 678 (5th Cir. 2017). The district court's wholesale dismissal violated Rule 12(b)(6) and this Court's binding precedent in *Anderson v. Valadez*, 845 F.3d 580 (5th Cir. 2016) by resolving disputed facts, drawing inferences against Comichi, and assessing the "correctness" of his allegations rather than accepting his well-pleaded facts as true.

The court made factual findings directly contradicted by body camera and Comichi's pleadings: it found Officer Pethel "observed" Comichi "halting" the tow when she arrived over two minutes after he exited, **ROA 196-97**, characterized him as "agitated and hostile" when video shows immediate compliance and simply trying to understand why he could not recover the vehicle, **Hamilton BWC 06:14 ROA 38**; found he was "detained" and "not free to leave" when Officer Pethel explicitly said "let me get your name before you leave," **Hamilton BWC 10:13**

**ROA 38; Lord BWC 05:00 ROA 40**; and made probable cause determinations requiring resolution of disputed questions about what officers witnessed, Comichi's intent and demeanor, and the meaning of municipal ordinance provisions. These procedural violations pervade the dismissal of every claim and require wholesale reversal for analysis under proper Rule 12(b)(6) standards.

The district court's dismissal also rests on disputed interpretation of City of Euless Municipal Code § 90-94(c). **ROA 193, 200**. The court held that moving the vehicle from the dog park to the street while partially hooked constituted "removal from the property," terminating Comichi's rights. But genuine disputes exist about whether intermediate repositioning to complete a hookup constitutes "removal" under the ordinance, particularly where the tow operator admitted the vehicle "was not 100% connected," **Hamilton BWC 04:59-05:08 ROA 38**, and required repositioning specifically to complete the hookup, *Id.* **at 13:55-14:15 ROA 38**. Whether "removal" means final transport to the tow yard or any movement during the hooking process cannot be resolved against Comichi at the pleading stage, especially where the tow operator's admission supports his position.

9

Alternatively, even if this Court finds no procedural error, each claim independently survives when well-pleaded facts are accepted as true and all inferences drawn in Comichi's favor. Officer Pethel recorded herself violating *Turner*, and *Florida v. Bostick*, 501 U.S. 429 (1991) ).

The interaction escalated when Pethel asked of Comichi: "Let me get your name before you leave," **Hamilton BWC 10:13 ROA 38; Lord BWC 05:00 ROA 40**—establishing a consensual encounter under *Bostick*. When Comichi declined to identify, she threatened: "You're going to give me your name or else you're under arrest," **Hamilton BWC 10:22-10:25 ROA 38; Lord BWC 5:10-5:15 ROA 40**. This transformation from consensual encounter to manufactured detention based solely on refusal to cooperate violates *Bostick*'s holding that "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," 501 U.S. at 437), and *Turner*'s holding that officers cannot arrest for refusing to identify during detention, 848 F.3d at 695.

The officers' conduct proves they knew Comichi's actions were protected by municipal law. Officers Hamilton and Pethel, and the tow operator, offered Comichi the option to pay a drop fee to stop the tow

10

under the municipal ordinance. **Hamilton BWC 5:00-5:17 ROA 38; Lord BWC 4:52-4:57 ROA 40**. Officers cannot simultaneously acknowledge someone's legal rights under municipal law and then arrest them for exercising those rights. This offer defeats probable cause for interference and the criminal negligence element of Texas Penal Code § 38.15(a)(1). When officers offer a suspect a legal pathway to resolve a dispute and acknowledge his conduct is protected by ordinance, that person cannot "ought to have been aware" his conduct was criminal. The drop fee negotiation also proves this was fundamentally a civil dispute that officers improperly criminalized rather than criminal interference.

Moreover, Texas Penal Code § 38.15(d) provides a statutory defense when "the interruption, disruption, impediment, or interference alleged consisted of speech only." When Officer Pethel detained Comichi, he was walking away after verbally accepting the tow would proceed. Any arguable interference at that point consisted solely of speech—declining to identify and verbally objecting— which is a statutory defense to the interference charge.

Both criminal charges lacked probable cause and arose from the same conduct. Officers Pethel and Lord arrived over two minutes after

Comichi exited the vehicle and witnessed only compliance—not unlawful interference. Officer Pethel explicitly threatened arrest for identification refusal, not interference. After the arrest, officers confirmed that both charges described identical conduct. Officer Hamilton stated, "I would just add fail to ID," and Officer Pethel responded, "That is exactly what I am doing," proving officers recognized they were applying multiple labels to the same refusal to comply. **Hamilton BWC 13:29-33 ROA 38**.

Under *Chiaverini v. City of Napoleon*, decided eight months before this incident, "if an invalid charge—say, one fabricated by police officers—causes a detention to start or continue, then the Fourth Amendment is violated." 602 U.S. 556, 563  (2024). Officer Pethel's explicit threat—"give me your name or else you're under arrest," **Hamilton BWC 10:22-10:25 ROA 38**—proves the invalid identification charge caused the arrest. No probable cause existed for interference because officers were facilitating a tow that violated municipal ordinance granting an "absolute right to regain possession," **ROA 12-13**, as confirmed by the tow operator's admission. The failure to identify charge was legally impossible because Texas Penal Code § 38.02 creates no duty to identify during detention, only after lawful arrest—yet Officer Pethel

explicitly stated she was "detaining" Comichi when she demanded his name. **Hamilton BWC 10:15-10:17 ROA 38**.

Additional Fourth Amendment violations independently support reversal: Officer Pethel conducted a pat-down search without reasonable suspicion that Comichi was armed and dangerous, **Hamilton BWC 6:50-7:15 ROA 38; Lord BWC 1:42-2:03 ROA 40**; Officer Lord made objectively false statements to his supervisor about events he never witnessed or informed of, **Lord BWC 11:55-12:00 ROA 40**; Officers Lord and Hamilton failed to intervene despite witnessing constitutional violations over several minutes, **ROA 23**; and the vehicle was seized under color of state law without warrant or exception despite municipal ordinance protection, **ROA 24, 27**.

Malicious prosecution claims survive because the Complaint adequately alleges all required elements under § 1983. Officers commenced and legally caused criminal proceedings through arrests and charging decisions. Both charges were dismissed without conviction, satisfying favorable termination under *Thompson v. Clark*, 596 U.S. 36 (2022) Lack of probable cause is demonstrated by Officer Pethel's manufactured detention and Detective Norwood's contemporaneous

finding that the officers lacked probable cause for the interference charge. Malice is inferable from lack of probable cause and procedural irregularities. Comichi was incarcerated for over 45 hours and endured prosecution until dismissal.

State law claims against the tow defendants are supported by the tow operator's recorded admission, **Hamilton BWC 04:59-05:08 ROA 38**, establishing violations of Texas Occupations Code § 2308.404 and the Texas Theft Liability Act, Chapter 134 of the Civil Practice and Remedies Code. **ROA 32-33**.

The district court's errors—whether viewed as procedural violations of *Anderson* or substantive misapplication of clearly established law—require reversal and remand for proper analysis under Rule 12(b)(6) standards.

## ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Anderson*, 845 F.3d at 589; *Morris v. Livingston*, 739 F.3d 740, 745 (5th Cir. 2014); *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).

When a qualified immunity defense is asserted at the Rule 12(b)(6) stage, this Court has made clear that "the district court must—as always—do no more than determine whether the plaintiff has filed a short and plain statement of his complaint, a statement that rests on more than conclusions alone." *Anderson*, 845 F.3d at 589 (quoting *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995). No heightened pleading standard applies merely because defendants assert qualified immunity. *Anderson*, 845 F.3d at 589-90. Moreover, courts cannot "consider the correctness of the plaintiff's version of the facts." *Id.* at 589.

When body camera videos are attached to the complaint, special rules apply. In *Scott v. Harris* , the Supreme Court held that courts may not adopt a party's version of facts when video evidence "blatantly

contradicts" that version. 550 U.S. 372, 380 (2007). This Court applied *Scott* in *Harmon v. City of Arlington*, holding that "where video recordings are included in the pleadings . . . the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradicts' those allegations." 16 F.4th 1159, 1163 (5th Cir. 2021).

This principle works in two directions. When video evidence blatantly contradicts a party's allegations, courts may disregard those allegations. *Scott*, 550 U.S. at 380 ). But when video evidence supports or does not contradict a party's allegations, courts must apply the standard Rule 12(b)(6) framework: accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmovant. *Anderson*, 845 F.3d at 589; *Harmon*, 16 F.4th at 1163.

Here, the body camera evidence supports Comichi's version of events on every material point. The videos prove Officer Pethel explicitly acknowledged Comichi was free to leave, that Officers Pethel and Lord arrived after Comichi had exited the vehicle, that Comichi immediately complied when asked to move to the sidewalk, that officers explicitly added the failure to identify charge because it described the same conduct

as the interference charge, and that Officer Lord's statement to his supervisor that Comichi refused to exit the vehicle was objectively contradicted by video. Because the video supports Comichi's allegations, all reasonable inferences must be drawn in Comichi's favor unless the video blatantly contradicts a specific allegation. The district court violated this standard.

## II. THE DISTRICT COURT VIOLATED RULE 12(b)(6) AND *ANDERSON V. VALADEZ* BY RESOLVING DISPUTED FACTS AND DRAWING INFERENCES AGAINST COMICHI AT THE PLEADING STAGE

The district court violated the most fundamental principle of Rule 12(b)(6) review: courts must accept plaintiff's well-pleaded facts as true and draw all reasonable inferences in plaintiff's favor. This procedural error pervades the entire dismissal and requires reversal. The court assessed the "correctness" of Comichi's allegations, resolved disputed questions against him, and made credibility and probable cause determinations—all expressly prohibited at the pleading stage. *Hicks v. LeBlanc*, 81 F.4th 497, 502 (5th Cir. 2023)

### A. *Anderson v. Valadez* Establishes the Controlling Standard

17

Qualified immunity at the pleading stage involves a two-step analysis. First, courts must "accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Anderson*, 845 F.3d at 589. *Anderson* forbids courts from considering "the correctness of the plaintiff's version of the facts" at this stage. *Id.*

Second, only after accepting all facts as true, courts determine whether "the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983[,] and would overcome their qualified immunity defense." *Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023) (alteration in original) (quoting *Terwilliger v. Reyna*, 4 F.4th 270, 279-80 (5th Cir. 2021)). The district court never reached step two because it violated step one by making factual findings that contradicted Comichi's pleadings and body camera evidence.

## B. The District Court Made Factual Findings Contradicted by Body Camera Evidence

The district court committed precisely the error *Anderson* prohibits by making factual findings directly contradicted by objective evidence. The court found: (1) Officer Pethel "observed" Comichi "halting" the tow when she arrived over two minutes after he exited the vehicle; (2) Comichi was "clearly agitated and acting in a hostile manner" when video

shows immediate compliance; and (3) Comichi "had been detained for questioning and was not free to leave" when Officer Pethel explicitly said "let me get your name before you leave." **ROA 196-98**. Each finding required assessing the "correctness" of Comichi's version—exactly what Anderson prohibits.

**The temporal impossibility is stark.** Officer Hamilton's body camera shows Comichi exited at 11:36:25 AM. **Hamilton BWC ROA 38.** Officer Lord's camera shows Officers Pethel and Lord arrived together at 11:38:35 AM—over two minutes later. **Lord BWC ROA 40**. When the arresting officers arrived, Comichi was standing outside the vehicle in dialogue with Officer Hamilton and tow operator Gibbons. **Hamilton BWC ROA 38**. He was not in the vehicle, not refusing to exit, and not actively halting the tow. Officer Pethel could not have "arrived" to observe Comichi "halting" anything when he had exited more than two minutes before her arrival.

The Complaint alleged Comichi complied with Officer Hamilton's order to exit, was outside the vehicle when Officers Pethel and Lord arrived, and these officers witnessed only compliance. **ROA 16**. Hamilton's body-worn camera shows that after he first asked Comichi to

step out of the vehicle, at **Hamilton BWC 02.21 ROA 38**, a few seconds later, Gibbons requested Comichi to instead "scoot over" to the passenger side, which he did. Once Gibbons was done, Hamilton then "ordered" Comichi to step out, at **Hamilton BWC 03:32 ROA 38.**, and Comichi did.

At Rule 12(b)(6), the court was required to accept these well-pleaded facts as true, particularly when objective timestamps support them. Instead, the court constructed a different scenario contradicted by video evidence—precisely what *Anderson* prohibits. 845 F.3d at 589.

**The characterization of Comichi as "hostile" is similarly contradicted.** At **Hamilton BWC 06:14 ROA 38**, as reflected on Hamilton's camera, when Officer Pethel first approached, she politely requested: "Come over and talk to me so that we aren't standing in the middle of the road." Comichi immediately complied without hesitation, argument, or delay. A person who immediately complies with an officer's first polite request demonstrates cooperation, not hostility. The video shows no threatening gestures, no physical aggression, and no refusal to comply.

This Court has cautioned courts against crediting officers' conclusory characterizations of demeanor over objective evidence. In

*United States v. Monsivais* this Court held that courts should "give little
or no weight to an officer's conclusional statement that a suspect
appeared nervous" or exhibited concerning demeanor because such
characterizations reflect "entirely natural reaction[s] to police presence"
and carry "no readily discernible connection to criminal activity." 848
F.3d 353, 359 (5th Cir. 2017). When video shows immediate compliance,
characterizing someone as "hostile" and "agitated" violates the
requirement to accept well-pleaded facts as true and draw all inferences
in Comichi's favor. *Anderson*, 845 F.3d at 589.

**Officer Pethel's own words prove the detention finding incorrect.**
Comichi accepted the fact that the truck would be towed and began to
walk away. Officer Pethel communicated with Comichi: "Let me get your
name ***before you leave***." (**Hamilton BWC 10:13 ROA 38)** and (**Lord
BWC 5:00 ROA 40**. This phrase unambiguously communicates that
Comichi was free to leave at that moment. The words "before you leave"
explicitly acknowledge that departure is an option and that compliance
with the identification request is voluntary. Only after Comichi declined
did Officer Pethel, declare "I spoke with you and you were detained so
you have to give me your name . . . I'm going to make it super easy for

you . . . you're going to give me your name or else you're under arrest . . . just give me your name so I don't have to take you to jail." **Hamilton BWC 10:13-11:00 ROA 38**. She then arrested him based on his continued refusal to identify.

This temporal sequence proves transformation from consensual encounter to manufactured detention.

The district court had this unambiguous video evidence proving Comichi was free to leave when Officer Pethel requested identification. Yet the court found Comichi "had been detained" and was "not free to leave"—directly contradicted by Officer Pethel's recorded words. Under *Scott v. Harris* and *Harmon v. City of Arlington*, when video evidence supports plaintiff's version, courts must adopt that version and draw all reasonable inferences in plaintiff's favor. 550 U.S. at 380; 16 F.4th at 1163.

## C. The District Court Resolved Disputed Statutory Interpretation Questions Against Comichi

The district court held that moving the vehicle from the dog park to the street "removed" it from the property, terminating Comichi's rights under City of Euless Municipal Code § 90-94(c). **ROA 200**. This determination violated Rule 12(b)(6) in two respects.

**First**, the ordinance is ambiguous. Section 90-94(c) grants an "absolute right to regain possession" when an operator arrives "before its removal from the property" **and** "before the vehicle is fully hooked up." These dual requirements must be harmonized to give independent effect to both provisions. The Texas Supreme Court calls this the "cardinal rule of statutory interpretation": courts "*may not* interpret a statute in a way that renders any part of it meaningless" and "must give effect to all words" rather than treating language as surplusage. *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 581 (Tex. 2020). *See also Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 164 (Tex. 2016) ("We apply rules of statutory construction to construe municipal ordinances.").

The district court's interpretation—that any movement terminates rights regardless of hookup status—renders "fully hooked up" meaningless surplusage. *Boykin v. State*, 818 S.W.2d 782, 786 (Tex. Crim. App. 1991) ("It would be illogical to presume that the Legislature intended a part of the statute to be superfluous"). Under this reading, tow operators could defeat consumer protections by moving vehicles inches while hookup remains incomplete—an absurd result. *Id.* at 785.

Comichi alleged the vehicle was moved "to complete the full hookup" because "the parking configuration at the dog park did not provide sufficient space." **ROA 13**. The tow operator admitted: "I was not 100% connected to it." **Hamilton BWC 04:59-05:08 ROA 38.** Comichi's interpretation—that "removal" means final departure for transport rather than intermediate repositioning during the hookup process— harmonizes both prongs of the ordinance, is supported by the tow operator's explicit admission, and aligns with the Texas Department of Licensing and Regulation's official interpretation emphasizing hookup status over vehicle location. **ROA 12**.

**Second**, applying the ordinance requires disputed factual determinations: whether the move was operational staging or final removal; what "fully hooked up" means in industry practice; and what the tow operator meant when admitting the hookup was incomplete. These disputes cannot be resolved against Comichi at Rule 12(b)(6).

This error infected dismissal of all claims. The finding that Comichi's "actions were not proper or protected" formed the basis for concluding officers had probable cause for arrest and tow defendants acted lawfully. **ROA 198, 203**. Because this foundational determination

24

rested on resolving statutory ambiguity and disputed facts against Comichi, reversal is required.

### D. The District Court Made Probable Cause Determinations Requiring Resolution of Disputed Facts

The district court concluded Officer Pethel "had probable cause to arrest Plaintiff for interference with public duties." **ROA 198-203**. This determination required resolving disputed factual questions inappropriate for Rule 12(b)(6): (1) **what officers observed and when**—whether Pethel witnessed interference or only post-exit compliance; (2) **Comichi's intent and demeanor**—whether he acted to interfere or to exercise rights that both the tow operator and officers acknowledged existed by admitting the vehicle was not "100% connected" and offering to facilitate drop fee payment under the municipal ordinance, **Hamilton BWC 04:59-05:08, 5:05-5:10 ROA 38**; and (3) whether the municipal ordinance protected his conduct—factual questions interwoven with legal interpretation that cannot be resolved against Comichi when the officers' own conduct supports his position.

Yet the district court made definitive probable cause findings, necessarily assessing the "correctness" of Comichi's allegations and rejecting them—violating *Anderson*'s core holding. 845 F.3d at 589.

Even at summary judgment—where courts may weigh evidence—disputed facts about probable cause for interference preclude resolution. *Smith v. Lopez*, 519 F. Supp. 3d 395, 408 (W.D. Tex. 2021) ("[T]here is a genuine dispute of material fact regarding the existence of probable cause to arrest [plaintiff] for interference. Because the material facts are disputed, the Court cannot find that there was a reasonable but mistaken belief that probable cause existed."). Here, at the Rule 12(b)(6) stage where all inferences must be drawn in Comichi's favor, the court's probable cause determination was doubly improper.

The district court compounded these errors by systematically drawing inferences favoring officers—treating Officer Lord's false statement that Comichi refused to exit as corroboration and parsing charges to avoid *Turner*—when Rule 12(b)(6) requires drawing all inferences in Comichi's favor.

## E. The Procedural Violations Require Reversal of All Claims

Because the district court applied the wrong legal standard to every claim, this Court should reverse the dismissal in its entirety and remand. When a district court violates fundamental procedural requirements affecting all claims, wholesale reversal is appropriate. Selectively

affirming some claims would require this Court to conduct the initial Rule 12(b)(6) analysis the district court should have performed.

The district court's factual and credibility findings infected every claim. The finding that Pethel "observed" interference affected false arrest analysis. The characterization of Comichi as "hostile" affected search analysis. The finding of detention affected *Turner* analysis. Because these erroneous findings formed the foundation for dismissing multiple claims, they must be set aside and all claims reconsidered under proper standards.

If the district court had accepted Comichi's well-pleaded facts as true—that he exited before Pethel arrived, immediately complied when asked to move, and was explicitly told he was "free to leave"—the analysis of every claim would differ. This Court should remand for that analysis under proper Rule 12(b)(6) standards.

## III. ALTERNATIVELY, EACH CLAIM INDEPENDENTLY SURVIVES UNDER PROPER RULE 12(b)(6) STANDARDS

Even if this Court finds no procedural error, each claim independently survives when well-pleaded facts are accepted as true and all inferences drawn in Comichi's favor. The body camera evidence

27

establishes violations of clearly established law sufficient to overcome qualified immunity.

## A. Officer Pethel Recorded Herself Violating *Turner v. Driver* and *Florida v. Bostick*

Officer Pethel's body camera captured a constitutional violation in real time. **At timestamp 10:13 (Hamilton BWC ROA 38) and 05:00 (Lord BWC ROA 40)**, Officer Pethel stated: "Let me get your name before you leave." This single sentence establishes the legal nature of the encounter. Under *Florida v. Bostick*, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions . . . as long as the police do not convey a message that compliance with their requests is required." 501 U.S. 429, at 434-35.

The phrase "before you leave" explicitly conveys that compliance is not required. It unambiguously communicates that Comichi is free to leave and that identification is a voluntary request. This is the paradigmatic consensual encounter *Bostick* describes and protects.

The video then captures Officer Pethel's transformation of this consensual encounter into detention. Officer Pethel declared that Comichi would be arrested if he did not identify himself. "You're going to give me your name or else you're under arrest." **Hamilton BWC 10:22-**

**10:25 ROA 38; Lord BWC 5:10-5:15 ROA 40**. Within seconds, Officer Pethel moved from acknowledging Comichi was free to leave to threatening arrest for the same identification refusal.

This transformation occurred for one reason: Comichi exercised his right to decline voluntary cooperation. *Bostick* explicitly prohibits this: "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." 501 U.S. at 437. Officer Pethel first violated *Bostick* by manufacturing detention based solely on refusal to cooperate. She then violated *Turner* by threatening arrest for refusing to identify during that manufactured detention.

This Court held in *Turner* that "police cannot arrest an individual solely for refusing to provide identification" during investigative detentions. 848 F.3d at 695. The Court emphasized that Texas Penal Code § 38.02 creates no duty to identify during detention—only after lawful arrest. *Id*. Officer Pethel's own admission that she was "detaining" Comichi establishes her personal knowledge that the statutory predicate for demanding identification was absent.

Officer Pethel executed the exact sequence *Turner* prohibits. She acknowledged the consensual encounter, requested voluntary

29

identification, witnessed refusal, manufactured detention status, and then threatened arrest specifically for identification refusal. The threat was explicit: "You're going to give me your name or else you're under arrest . . . . just give me your name so I don't have to take you to jail for this." **Hamilton BWC10:22-10:25 ROA 38; Lord BWC 5:10-5:23 ROA 40.** *Turner* was decided in 2017—over seven years before this September 2024 incident. No reasonable officer could believe that explicitly acknowledging a consensual encounter while demanding identification, then arresting for refusal, complied with the Fourth Amendment.

## B. Both Charges Arose From the Same Conduct and *Chiaverini* Prohibits the District Court's Parsing

The district court held Turner does not apply because Comichi "was not arrested solely for failure to identify himself" but rather "for interference with public duties," with the failure to identify charge "added later." **ROA 202**. This temporal parsing of charges conflicts with *Chiaverini v. City of Napoleon*, decided eight months before this September 2024 incident. Under *Chiaverini*, "if an invalid charge . . . causes a detention to start or continue, then the Fourth Amendment is violated." 602 U.S. at 563. The Court rejected any categorical rule that one valid charge bars claims relating to invalid charges. *Id.* at 559. The

body camera evidence—and at this stage, Comichi's pleadings—prove the invalid identification charge caused this arrest under any standard.

**Officer Pethel explicitly identified identification refusal as the basis for arrest.** She threatened: "[G]ive me your name *or else* you're under arrest." **Hamilton BWC 10:13-11:00 ROA 38**. This recorded threat demonstrates that the identification demand—and Comichi's refusal—triggered the arrest. Officer Pethel did not say "you're under arrest for interference." She said, twice in less than a minute: "give me your name or else you're under arrest . . . . just give me your name so I don't have to take you to jail for this." **Hamilton BWC 10:22-10:25 ROA 38; Lord BWC 5:10-5:23 ROA 40**. The causal connection is explicit and undeniable.

**Officers later confirmed both charges described the same conduct.** After Comichi was arrested and placed in the patrol car, the following exchange occurred at timestamp **Hamilton BWC13:29-13:33 ROA 38**:

**Officer Hamilton:** "I would just add fail to ID."

**Officer Pethel:** "That is exactly what I am doing."

The word "add" and phrase "exactly what I am doing" prove officers recognized they were applying multiple labels to the same refusal to

comply. A reasonable inference, in Comichi's favor, could also be that the officers knew that they could not arrest him simply for failing to identify—or they did not know any better and thought that Comichi's refusal to identify was interference.

Either way, no separate act of interference occurred between the time Pethel recognized Comichi's right to leave and the actual arrest. Comichi did not return to the vehicle, did not physically obstruct the tow, did not threaten officers. The only conduct was continued refusal to identify—the same conduct Officer Pethel threatened to arrest him for.

**This satisfies causation under any standard.** While *Chiaverini* left open the precise causation test, 602 U.S. at 565, three factors prove the invalid charge caused this detention under any standard:

First, **Officer Pethel's explicit threat** establishes but-for causation. She told Comichi he would be arrested "or else" he provided his name. Without the refusal to identify, no arrest would have occurred at that moment. The threat itself proves causation.

Second, **the temporal sequence** demonstrates that the invalid charge initiated the arrest. Officer Pethel manufactured detention based solely on identification refusal. The "interference" label was applied

afterward to the same conduct. An arrest triggered by an invalid demand cannot be saved by post-hoc relabeling.

Third, **officers' own words** establish they viewed the charges as describing the same conduct. When Officer Hamilton suggested "adding" the failure to identify charge and Officer Pethel agreed "that is exactly what I am doing," they acknowledged overlap rather than independence.

Drawing all inferences in Comichi's favor at Rule 12(b)(6), this dialogue proves officers recognized both charges arose from identical conduct.

When the primary articulated basis for arrest—identification refusal during detention—lacks probable cause under *Turner*, the entire arrest is unlawful. Officers cannot cure a *Turner* violation by subsequently labeling the same conduct "interference." *Chiaverini* confirms that one valid-sounding charge cannot insulate officers from liability for an invalid charge that caused the detention. 602 U.S. at 559, 563.

## C. No Probable Cause Existed for Either Charge

Even accepting the district court's characterization that the charges were independent, no probable cause existed for arrest on either theory.

The interference charge required resolving disputed questions about whether Comichi's conduct was protected by municipal law. The identification charge was legally impossible under Texas Penal Code § 38.02 because Officer Pethel explicitly acknowledged she was detaining rather than arresting Comichi when she demanded his name. Moreover, neither arresting officer witnessed conduct that could constitute unlawful interference.

### 1. The Interference Charge Required Resolving Whether Comichi's Conduct Was Protected

Officers cannot have probable cause to arrest for interference when the threshold legal question—whether the person's conduct was protected by law—depends on disputed statutory interpretation and factual determinations that were unresolved at the time of arrest.

Texas Penal Code § 38.15(a)(1) criminalizes interference only when a person "interrupts, disrupts, impedes, or otherwise interferes with" a peace officer "performing a duty or exercising authority imposed or granted by law." Officers facilitating a tow that violates municipal ordinance granting vehicle operators an "absolute right to regain possession" are not exercising lawful authority. More fundamentally, Comichi cannot have "interfered" by exercising legal rights the municipal

ordinance expressly granted him. Appellees also recognized that Comichi had rights under the ordinance, because they offered for him to pay a drop fee to stop the hookup. **Hamilton BWC 5:05-5:10 ROA 38.**

He could not have interfered by not paying the drop fee. The ordinance grants an "absolute right to regain possession" when an operator arrives "before the vehicle is fully hooked up." **ROA 12**.

This Court has held that protected conduct cannot provide probable cause regardless of how officers characterize it. *Bailey v. Iles*, 87 F.4th 275, 288 (5th Cir. 2023). Officers "may not disregard facts tending to dissipate probable cause." *Id.* at 286, 288. Here, officers disregarded the tow operator's admission that Comichi was "right," the municipal ordinance protecting his conduct, and his voluntary compliance with lawful orders after exiting the vehicle. When the person whose conduct allegedly constituted interference admits the other person "was right" about their legal position, probable cause dissipates.

In order to violate Texas Penal Code § 38.15, "a person's interference must consist of more than speech alone." *Voss v. Goode*, 954 F.3d 234, 239 (5th Cir. 2020). "[M]erely arguing with police officers about the propriety of their conduct . . . does not constitute probable cause to

arrest someone for interference." *Id*. (quoting *Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007). When Officer Pethel detained Comichi, he was walking away after verbally accepting the tow would proceed—conduct consisting of speech and voluntary departure, not physical interference. **Hamilton BWC 10:11-10:25 ROA 38**. Rather, his interference—if any—consisted solely of speech: declining to identify, verbally objecting to the tow, and discussing his rights under the ordinance. Comichi's speech-only conduct defeats probable cause for interference as a matter of law.

### 2. Officers' Offer to Negotiate a Drop Fee Proves They Knew Comichi's Conduct Was Protected

Gibbons', Hamilton's, and Pethel's conduct provides conclusive evidence they recognized Comichi's actions were protected by municipal law. Gibbons offered to stop the tow if Comichi paid a drop fee. **Hamilton BWC 5:05-5:10 ROA 38**. Officer Hamilton told Comichi, "Pay the drop fee or don't." **Hamilton BWC 5:55-5:17 ROA 38**. Pethel offered Comichi to see if Gibbons would take a drop fee to stop the tow. **Hamilton BWC 5:05-5:10 ROA 38.** By offering this negotiation, officers explicitly acknowledged that: (1) the municipal ordinance granting rights to reclaim vehicles applied; (2) Comichi had legally protected options under that ordinance; (3) the proper resolution was civil payment and

negotiation, not criminal arrest; and (4) this was a civil dispute, not criminal interference.

Officers cannot simultaneously offer someone a lawful mechanism to exercise their rights under municipal law and then arrest them for exercising those same rights. The offer to negotiate a drop fee proves officers knew—at the time they arrested Comichi—that his conduct was protected by the ordinance. This knowledge defeats any claim of probable cause for interference. *See Bailey*, 87 F.4th at 288 (holding that officers "may not disregard facts tending to dissipate probable cause").

Moreover, the drop fee negotiation defeats the "criminal negligence" element required by § 38.15(a)(1). Texas Penal Code § 6.03(d) defines criminal negligence as conduct where a person "ought to be aware of a substantial and unjustifiable risk" that his actions are unlawful, and where the failure to perceive the risk constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Smith v. Lopez*, 519 F. Supp. 3d 395, 402 (W.D. Tex. 2021). From Comichi's standpoint—having been told by the tow operator that he was "right" about the incomplete hookup, and offered a drop fee by officers acknowledging his

ordinance rights—believing his conduct was lawful was not even negligent, much less a gross deviation from the standard of care. Officers cannot establish criminal negligence when they themselves communicated that the person's understanding was legally correct.

The drop fee offer also proves this was fundamentally a civil dispute that officers improperly criminalized. In typical interference cases, suspects physically fight police, refuse lawful orders, or obstruct ongoing duties through clearly criminal conduct. Here, officers acknowledged Comichi had civil rights under municipal ordinance, offered him a civil resolution mechanism, engaged in negotiations, and only arrested him after civil negotiations failed and he declined to voluntarily identify himself. This sequence proves the arrest was manufactured after a civil dispute, not based on criminal interference.

### 3. Neither Arresting Officer Witnessed Conduct Constituting Interference

Officers cannot establish probable cause by pointing to post-hoc legal interpretations resolved months later in motion practice. Probable cause requires "the totality of facts and circumstances within a police officer's knowledge *at the moment of arrest.*" *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (emphasis in original). At the moment

of arrest, Officers Pethel and Lord knew that Comichi had entered a vehicle before it was "fully hooked up," that the tow operator admitted that he was not fully hooked up, and that municipal law granted rights in such circumstances—as discussed above, officers explicitly acknowledged these rights by offering to negotiate a drop fee under the municipal ordinance. They also knew Comichi had exited the truck voluntarily, complied with requests to move to the sidewalk, and was walking away when Officer Pethel detained him for identification purposes.

Probable cause must be assessed based on what the arresting officers knew. Officers Pethel and Lord—who made the arrest decision and executed the arrest—did not witness Comichi in the vehicle, did not witness him refusing to exit (nor were they aware of Hamilton's observations), and did not witness any conduct that could constitute interference with Officer Hamilton's duties.

Officer Hamilton's body camera shows Comichi exited at timestamp 11:36:25 AM. **Hamilton BWC 03:38 ROA 38**. Officers Pethel and Lord arrived at timestamp 11:38:35 AM—over two minutes later. **Lord BWC 00:38 ROA 40**. When the arresting officers arrived, Comichi was

standing outside the vehicle in dialogue with Officer Hamilton and the tow operator. He was not in the vehicle, not refusing to exit, and not actively impeding the tow.

When Officer Pethel asked Comichi to step to the sidewalk, he immediately complied without hesitation or argument. **Lord BWC 01:03-01:05 ROA 40**. The arresting officers witnessed only cooperation and compliance. While officers may sometimes rely on information from other officers to establish probable cause, they cannot manufacture probable cause for interference by arresting someone whose only observed conduct was voluntary compliance. When viewing the complete interaction, as detailed in Hamilton's BWC, he never relayed any unlawful interference or noncompliance to Pethel or Lord.

Officer Lord's statement to his supervisor reveals the problem. Lord told his supervisor: "We told him to get out and move, and he's not." **Lord BWC 11:55-12:00 ROA 40.** This statement was objectively false. Comichi had exited over two minutes before Lord arrived, and Comichi immediately complied when Pethel asked him to move to the sidewalk.

Officers Pethel and Lord simply encountered a person standing peacefully outside a vehicle, asked him to move, witnessed his immediate

compliance, and then arrested him when he declined to voluntarily identify himself.

### 4. The Failure to Identify Charge Was Legally Impossible

The failure to identify charge suffered from legal impossibility. Texas Penal Code § 38.02(a) criminalizes failure to identify only when a person "intentionally refuses to give his name . . . to a peace officer who has lawfully arrested the person." Tex. Penal Code § 38.02(a).

Officer Pethel's own words prove no lawful arrest had occurred when she demanded identification. She stated: "I spoke with you and you were detained." **Hamilton BWC 10:15-10:17 ROA 38**. She explicitly identified the encounter as detention, not arrest. Because Section 38.02 creates a duty to identify only after lawful arrest, Comichi had no legal obligation to identify himself when Officer Pethel demanded his name during what she acknowledged was a detention.

As discussed, "police cannot arrest an individual solely for refusing to provide identification" during investigative detentions. *Turner*, 848 F.3d at 695. Officer Pethel's arrest violated *Turner* by arresting Comichi

for refusing to do something Texas law did not require him to do.[2] Her subsequent arrest for that refusal cannot cure the absence of probable cause at the moment she demanded identification.

Moreover, Officer Pethel manufactured the detention that led to arrest. She explicitly communicated that Comichi was free to leave, but he needed to identify. Under *Florida v. Bostick*, "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention." 501 U.S. at 437.

Officer Pethel violated *Bostick* and *Turner* by transforming a consensual encounter into detention based solely on Comichi's refusal to identify. Officers cannot create probable cause for arrest by first unlawfully detaining someone, then demanding information that person has no legal duty to provide, and finally arresting them for declining to provide it.

---

[2] The district court emphasized that Comichi "continued to refuse to identify himself at the Hurst Jail," suggesting this provided independent basis for the failure-to-identify charge. **ROA 196**. This reasoning is circular. Texas Penal Code § 38.02(a) criminalizes refusing to identify only when a person "intentionally refuses to give his name . . . to a peace officer who has **lawfully arrested** the person." (emphasis added). If the initial arrest was unlawful—as Comichi alleges and as Detective Norwood's prompt dismissal of the interference charge confirms (**ROA 17, 26-30**)—then no duty to identify ever arose under § 38.02, regardless of how many times officers demanded identification. Officers cannot cure an unlawful arrest by repeatedly asking for identification after an invalid seizure.

The temporal sequence proves the identification charge caused the arrest under any causation standard. Officer Pethel threatened explicitly: "You're going to give me your name or else you're under arrest." **Hamilton BWC 10:22-10:25 ROA 38; Lord BWC 05:10-05:15 ROA 40**. The threat establishes but-for causation. Without the identification refusal, no arrest would have occurred at that moment. Between Officer Pethel's acknowledgment that Comichi was "free to leave" and the actual arrest, Comichi committed no additional acts beyond continued refusal to identify. He did not return to the vehicle, did not physically obstruct the tow, did not threaten officers, and did not refuse any lawful command. The only conduct was refusing to voluntarily identify himself after he refused to pay a drop fee and acknowledged that the vehicle was getting towed. **Hamilton BWC 10:11-10:25 ROA 38; Lord BWC 05:00-05:15 ROA 40**.

Officers later confirmed both charges described the same conduct. After Comichi was arrested and placed in the patrol car, Officer Hamilton stated: "I would just add fail to ID." Officer Pethel responded: "That is exactly what I am doing." **Hamilton BWC 13:29-13:33 ROA 38**. The word "add" and phrase "exactly what I am doing" prove officers

43

recognized they were applying multiple labels to the same refusal to comply. Drawing all inferences in Comichi's favor at Rule 12(b)(6), this dialogue establishes that officers understood both charges arose from identical conduct—refusing to identify.

Because neither charge was supported by probable cause, the arrest violated the Fourth Amendment. The interference charge required officers to resolve disputed questions about whether Comichi's conduct was protected by municipal ordinance and whether he could be criminally negligent for reasonably relying on statutory rights the tow operator confirmed existed. The identification charge was legally impossible because Officer Pethel acknowledged she was detaining rather than arresting Comichi when she demanded his name. And both charges ultimately described the same conduct—Comichi's refusal to provide information he had no legal duty to disclose during a manufactured detention.

No probable cause existed for arrest on either theory. This is clear because Pethel was ready to let Comichi walk away as soon as he identified himself.

### D. Officer Pethel Conducted an Unlawful Pat-Down Search

Officer Pethel conducted a pat-down search of Comichi, as observed on **Hamilton BWC 6:50-7:15 ROA 38; Lord BWC 1:42-2:03 ROA 40**, without reasonable suspicion that he was armed and dangerous, violating *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *Terry* permits brief pat-downs only when officers have reasonable suspicion "that the person apprehended is committing or has committed a criminal offense" and "reasonably suspect that the person stopped is armed and presently dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) (citing *Terry* generally). The officer must "point to specific and articulable facts" supporting danger. *Terry*, 392 U.S. at 21.

Officer Pethel had no articulable facts supporting reasonable suspicion that Comichi was committing a crime or that he was armed and presently dangerous. The body camera shows that when Officer Pethel first approached Comichi, she  requested: "Come over and talk to me so that we aren't standing in the middle of the road." **Hamilton BWC ROA 6:15-6:18 ROA 38; Lord BWC 1:03-1:05 ROA 40**. Comichi immediately complied without hesitation. A person who immediately complies with an officer's first polite request demonstrates cooperation, not danger.

Nothing in the video or Complaint suggests Comichi displayed threatening behavior, made furtive movements, exhibited visible bulges suggesting weapons, verbally threatened officers, or refused lawful commands. Comichi had been standing outside the vehicle for over two minutes before Officer Pethel arrived. He was not fleeing, not physically aggressive, and immediately complied when asked to move to the sidewalk. Officer Pethel conducted the search within seconds of Comichi's compliance—precisely when his cooperative demeanor should have allayed rather than heightened safety concerns.

This was a civil dispute over vehicle towing, not an investigation of violent crime, drug trafficking, or any offense typically associated with weapons. No reasonable officer could believe that a person who immediately complies, has been standing peacefully for several minutes, and exhibits no threatening conduct poses danger justifying a pat-down search. The law has been clearly established since 1968 that officers may not conduct searches absent reasonable suspicion tailored to specific circumstances. *Terry*, 392 U.S. at 30.

### E. Officer Lord's Statement to His Supervisor Was Objectively False

Officer Lord told his supervisor: "we told him to get out and move, and he's not." **Lord BWC 11:55-12:00 ROA 40** This statement was objectively incorrect. Comichi exited at 11:36:25 AM. Officer Lord arrived at 11:38:35 AM—over two minutes later. Officer Hamilton never discussed his observations with Officer Lord. Therefore, the temporal impossibility is absolute: Officer Lord could not have told—or known of Officer Hamilton's request to—Comichi to "get out" when Comichi was not in the vehicle by the time Lord arrived.

Moreover, when Officer Pethel asked Comichi to move from the roadway to the sidewalk, Comichi immediately complied. **Hamilton BWC ROA 6:15-6:18 ROA 38; Lord BWC 1:03-1:05 ROA 40**. The video shows no refusal, no argument, no hesitation. Officer Lord's characterization that Comichi "is not" moving is contradicted by video showing prompt compliance.

Drawing all inferences in Comichi's favor at Rule 12(b)(6), Officer Lord's objectively false statement reveals consciousness that the actual arrest basis—identification refusal during detention—violated *Turner*. *Florida v. Bostick* was decided in 1991 and *Turner* in 2017. By September 2024, the law was unmistakably clear. Officer Lord's statement shifted

the focus from identification refusal to interference. This pattern suggests a deliberate effort to obscure the *Turner* violation.

## F. Officers Lord and Hamilton Violated Clearly Established Law by Failing to Intervene

The Complaint alleged Officers Lord and Hamilton witnessed Officer Pethel violate Comichi's constitutional rights yet failed to intervene despite having "ample time and opportunity" as "the events unfolded over several minutes." **ROA 23**. An officer may be liable for failure to intervene when that officer "knows that a fellow officer is violating an individual's constitutional rights," has "a reasonable opportunity to prevent the harm," and "chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

The Complaint identified three violations Officers Lord and Hamilton witnessed: Officer Pethel's unlawful pat-down search without reasonable suspicion, her threat to arrest Comichi for refusing to identify during detention, and execution of that unlawful arrest. **ROA 23**. Officer Lord's active facilitation is particularly significant. When Officer Pethel conducted the pat-down search, Officer Lord "volunteered to hold Plaintiff's phones" during the search. **ROA 23.** This was not passive observation; it was active participation in facilitating an unconstitutional

search. Officer Hamilton "stood there and watched" as violations unfolded over several minutes. **ROA 23.**

These underlying violations involved clearly established law Officers Lord and Hamilton would have recognized. *Terry v. Ohio* established in 1968 that officers may not conduct pat-downs without reasonable suspicion of present danger. 392 U.S. at 27. *Turner* clearly established that officers cannot arrest individuals for refusing to identify during detention. 848 F.3d at 695. *Florida v. Bostick* clearly established that refusal to cooperate alone cannot justify detention. 501 U.S. at 437.

When Officer Pethel transformed the encounter into detention, and then arrest, based solely on Comichi's refusal to identify himself, Officers Lord and Hamilton witnessed *Bostick* and *Turner* violations. At any point during this extended sequence, they had reasonable opportunity to intervene by questioning Officer Pethel's actions, suggesting alternative approaches, or refusing to facilitate the unlawful search and arrest.

## G. The Vehicle Seizure Violated the Fourth Amendment

The Complaint alleged defendants, "acting under color of state law, conspired to violate Plaintiff's Fourth Amendment rights by seizing the truck without lawful authority." **ROA 24**. This Court recently held that

"impounding a vehicle qualifies as a seizure subject to a Fourth Amendment analysis." *Degenhardt v. Bintliff*, 117 F.4th 747, 756 (5th Cir. 2024).

The Complaint adequately alleged tow operators acted under color of state law because Texas Occupations Code § 2308.255(e) explicitly designates tow truck operators conducting nonconsent tows as "agents of the law enforcement agency." **ROA 24**. Such legislative designation establishes state action. *West v. Atkins*, 487 U.S. 42, 49 (1988).

The seizure lacked a warrant or applicable exception. The Complaint alleged the vehicle posed no safety threat and City of Euless Municipal Code § 90-94(c) granted Comichi an "absolute right to regain possession" because he arrived before full hookup. **ROA 30-31,**. The tow operator admitted to Hamilton: "He's right, I was not 100% connected to it." **Hamilton BWC at 04:59-05:08; ROA 38**. This seizure violated both municipal law and the Fourth Amendment.

**On standing**, the Supreme Court's decision in *Byrd v. United States* fundamentally changed Fourth Amendment analysis for rental vehicles. 584 U.S. 395 (2018) . *Byrd* held that "the mere fact that a driver in lawful possession or control of a rental car" even when "not listed on

the rental agreement," still has "a reasonable expectation of privacy" sufficient for Fourth Amendment protection. 584 U.S. at 411.

Comichi's position is stronger than the defendant in *Byrd*. The Complaint alleged express authorization from his nephew (the renter) to "access and use the truck if needed during his absence," financial ownership because Comichi paid for the rental, and purpose-driven authorization to care for family property. **ROA 11**. These allegations establish lawful possession and control under *Byrd*. At Rule 12(b)(6), the court was required to accept these allegations as true.

This Court consistently recognizes Fourth Amendment standing for authorized vehicle users. In *United States v. Kye Soo Lee* ), this Court held that "where a person has borrowed an automobile from another, with the other's consent, the borrower becomes a lawful possessor of the vehicle and thus has standing" to challenge searches and seizures. 898 F.2d 1034, 1038 (5th Cir. 1990). The borrower need not be named on any ownership document; consent from the owner or authorized renter suffices.

## H. Malicious Prosecution Claims Satisfy *Thompson v. Clark*

The Complaint alleged "Defendants engaged in malicious prosecution by initiating and continuing criminal charges against Plaintiff without probable cause." **ROA 25**. Both charges were terminated in Comichi's favor. **ROA 17**. Detective Norwood determined defendants "lacked probable cause to charge him with Interference with Public Duties." **ROA 26-30**. Comichi "was held in jail for 48 hours" before charges were dismissed. **ROA 17**.

The Supreme Court's decision in *Thompson v. Clark* held that malicious prosecution plaintiffs "need only show that his prosecution ended without a conviction." 596 U.S. 36, 39 (2022). The Court explicitly rejected any requirement to prove innocence or that the prosecution ended with "some affirmative indication of innocence." *Id*. at 49. Dismissal without conviction suffices for favorable termination.

The Fifth Circuit explicitly adopted *Thompson* in *Espinal v. City of Houston*, decided in March 2024—six months before this incident. 96 F.4th 741, 748 (5th Cir. 2024).

The Complaint adequately alleges each element: (1) criminal proceedings were commenced on two charges; (2) Officers Pethel, Lord, Hamilton, and Detective Norwood legally caused these proceedings

through arrests, reports, and charging decisions; (3) proceedings terminated in Comichi's favor when both charges were dismissed without conviction; (4) absence of probable cause is established by Officer Pethel's acknowledgment Comichi was free to leave, manufactured detention upon refusal to identify, arrest for conduct *Turner* protects, and Detective Norwood's contemporaneous determination defendants "lacked probable cause," **ROA 30**; (5) malice can be inferred from lack of probable cause combined with procedural irregularities—Officer Pethel's transformation from acknowledging Comichi was "free to leave" to manufacturing detention, Officer Lord's objectively false statement, and the decision to "add" the failure to identify charge; and (6) damages are adequately alleged—Comichi was incarcerated for approximately 45 hours, suffered stress and humiliation of arrest and jail, incurred expenses, and endured prosecution until dismissal. **ROA 25-30.**

Malicious prosecution is doctrinally distinct from false arrest. False arrest concerns the initial seizure; malicious prosecution concerns "wrongful institution of legal process." *Wallace v. Kato*, 549 U.S. 384, 389-90 (2007). Even if probable cause existed for initial arrest (it did not), initiating legal process despite lacking probable cause constitutes

malicious prosecution. Here, Detective Norwood, presumably reviewing all reports and videos, determined on September 24 that defendants "lacked probable cause," yet Comichi remained incarcerated. **ROA 28**. Continuing detention and prosecution after a detective determines lack of probable cause states a malicious prosecution claim independent of any false arrest claim.

## I. Recorded Admissions Support State Law Claims

The district court dismissed state law claims against B & B Wrecker Service and Bert Gibbons, holding "Plaintiff's actions were not proper or protected" under the municipal ordinance. **ROA 204**. This holding contradicted the tow operator's own recorded admission and violated principles of supplemental jurisdiction.

Texas Occupations Code § 2308.404 creates strict liability for towing companies violating Chapter 2308. Since the municipal ordinance required release of the truck to Comichi before it was fully hooked up, B&B Wrecker Service and Bert Gibbons violated Sections 2308.208 and 2308.255, which mandate compliance with applicable municipal ordinances. Gibbons admitted: "I was not 100% connected to it." **Hamilton BWC 04:59-05:08 ROA 38**. This establishes the vehicle was

not "fully hooked up" under Euless Municipal Code § 90-94(c); Comichi's entry occurred during the protected period when the ordinance grants an "absolute right to regain possession"; Gibbons knew Comichi was legally correct; and the subsequent tow violated both municipal ordinance and state law, triggering strict liability under § 2308.404.

The district court's contrary finding directly contradicts this explicit admission and violates Rule 12(b)(6)'s requirement to accept well-pleaded facts as true.

The Texas Theft Liability Act provides civil remedies for "unlawfully appropriating property with intent to deprive the owner of property." Tex. Civ. Prac. & Rem. Code § 134.002(2). The Complaint alleges unlawful appropriation despite Comichi's presence in the vehicle, knowledge that he was an authorized agent, Gibbons' admission the truck was not fully hooked up, and the municipal ordinance granting an "absolute right" to reclaim. **ROA 32-33**. By taking the vehicle when municipal law granted an "absolute right" to reclaim it, defendants demonstrated the intent to deprive required under the statute.

These state law claims arise from the same operative facts as federal claims and would benefit from unified resolution in a single

proceeding. The district court abused its discretion in declining to exercise supplemental jurisdiction over claims so closely related to federal claims. If this Court reverses federal claims, it should remand state law claims for consideration under proper standards that credit rather than contradict the tow operator's admission.

## CONCLUSION

The district court violated Rule 12(b)(6) and *Anderson v. Valadez* by resolving disputed facts and drawing inferences against Comichi at the pleading stage. Body camera evidence supports Comichi's well-pleaded allegations and establishes violations of clearly established law. For these reasons, Appellant respectfully requests that this Court REVERSE the district court's judgment and REMAND for further proceedings.

SUBMITTED BY:

S/Brandon Grable
State Bar No.24086983
Grable, P.L.L.C.
12451 Starcrest Drive
San Antonio, TX 78216
Telephone: 210-963-5297
Facsimile: 726-215-4765

## CERTIFICATE OF SERVICE

I certify that on this 13th day of October 2025, the foregoing document was filed with the Court's CM/CEF electronic filing system, and that a copy of said documents was served upon all parties of record, via electronic service.

**D.Randall Montgomery & Associates, PLLC**
12400 Coit Road, Suite 560
Dallas, TX 75251
Telephone:214-292-2602

**D.Randall Montgomery**
rmontgomery@drmlawyers.com

**Alyssa M. Barreneche**
abarreneche@drmlawyers.com

**Duane Morris, LLP**
300 Throckmorton Street, Suite 1650
Fort Worth, TX 76102
Telephone:214-292-2602

**Christopher Brown**
CABrown@duanemorris.com

S/Brandon Grable

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1:  this document contains 9720 words.

2.  This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook.


S/Brandon Grable